**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------x
                              :
DANIEL KHESIN                 :    Civ. No. 3:20CV01580(SALM)
                              :
v.                            :
                              :
AETNA LIFE INSURANCE COMPANY  :
and HARTFORD LIFE AND         :
ACCIDENT INSURANCE COMPANY    :    July 20, 2022
                              :
------------------------------x
```

**MEMORANDUM OF DECISION**

Plaintiff Daniel Khesin ("plaintiff") has brought this action pursuant to the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(e). See Doc. #1. Plaintiff seeks judicial review of the denial by Hartford Life and Accident Insurance Company ("Hartford" or "defendant")[1] of his claim for long term disability ("LTD") benefits under a group LTD plan in which plaintiff participated. See generally id.

The parties agreed to a bench trial on a stipulated record and the written briefing pursuant to Rule 52 of the Federal Rules of Civil Procedure. See Doc. #41. The parties filed opening trial memoranda on January 21, 2022 [Docs. #53, #54], to

---

[1] Each party represents that during the underlying administrative proceedings, Hartford acquired Aetna Life Insurance Company's ("Aetna") group benefits business. See Doc. #53 at 7, n.1; Doc. #54 at 4. Hartford is now acting on behalf of Aetna as its attorney-in-fact. See Doc. #53 at 7, n.1. For purposes of this Ruling, the Court refers only to Hartford as the defendant.

which separate responses were filed [Docs. #57, #58]. Each party has also filed a reply brief. [Docs. #61, #62]. A bench trial was held on April 11, 2022, at which counsel confirmed their clients' consent to a bench trial on the written submissions and waived the right to call witnesses. See O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011).

Upon consideration of the parties' written briefing, the stipulated record [Doc. #51], the oral argument of counsel, and for the reasons set forth below, the Court **AFFIRMS** the defendant's decision to deny LTD benefits.

I.   **Findings of Fact**

The following findings of fact are based upon the stipulated record. [Doc. #51].[2]

A.   Administrative Background and Policy

Plaintiff served as the "Founder and Innovator" of DS Healthcare Group, Inc. until July 13, 2017, at which time he alleges he became disabled by neuromyelitis optica ("NMO"), also known as Devic's Disease. STD1344-58; see also STD171, STD204, AR2513.

ADP TotalSource, Inc. provided DS Healthcare's employees, including plaintiff, with LTD benefits under Group Number GP-

---

[2] The Court cites to the Bates numbering as reflected in the administrative record. See Doc. #51.

866287 ("LTD Policy"). <u>See generally</u> AR1-148. On August 21, 2017, plaintiff applied for Short Term Disability ("STD") benefits, claiming disability since July 13, 2017. <u>See</u> STD171, STD204. On September 27, 2017, plaintiff applied for Long Term Disability ("LTD") benefits. <u>See</u> STD1362.

The LTD Policy sets forth two tests for determining disability. <u>See</u> AR123. The first test applies to the first 24 months of disability:

> From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that:
>
> - You cannot perform the **material duties** of your **own occupation** solely because of an **illness, injury** or disabling pregnancy-related condition; and
> - Your earnings are 80% or less of your **adjusted predisability earnings.**

<u>Id.</u> (hereinafter the "own occupation test"). The LTD Policy defines "own occupation" as: "The occupation that you are routinely performing when your period of disability begins[] ... as it is normally performed in the national economy[.]" AR139.

The second test applies after the first 24 months:

> ***After the first 24 months of your disability*** that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness, injury** or disabling pregnancy-related condition.

AR123. (hereinafter the "reasonable occupation test"). The LTD Policy defines "reasonable occupation" as:

> [A]ny gainful activity:

▪ For which you are, or may reasonably become, fitted by education, training, or experience; and
▪ Which results in, or can be expected to result in, an income of more than 80% of your **adjusted predisability earnings.**

AR140. The LTD Policy provides defendant with "discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under th[e] Policy[.]" AR73.

Plaintiff's claim for LTD benefits was initially denied on May 4, 2018, because "the medical information" provided did "not support his disability" under the own occupation test. AR508. Defendant received plaintiff's appeal of that determination on October 4, 2018. See AR512. By letter dated November 29, 2018, defendant "overturned" its "initial decision ... effective 10/11/2017[,]" AR542, and "confirmed [plaintiff met] the Plan's" own occupation test of disability. AR543.

Defendant sent a letter to plaintiff's counsel dated October 14, 2019, reminding counsel that "[i]n order to be entitled to LTD benefits after October 11, 2019, [plaintiff] must meet the plan's new definition of disabled." AR558; see also AR566.

By letter dated December 20, 2019, defendant informed plaintiff's counsel that it had "made a decision to deny [plaintiff's] claim[,]" and that it was "no longer approving

[plaintiff's LTD] claim starting on December 21, 2019." AR598. Based on a review of the "most recent medical evidence in [plaintiff's] file in its totality[,]" AR599, defendant determined that the evidence did "not support the presence of a functional impairment, which would preclude [plaintiff] from performing full time sedentary physical demand level occupation." AR600. The decision identified five jobs which plaintiff "would be reasonably suited to perform and [we]re within [his] confirmed work capacity[.]" Id. The letter also stated that these jobs met or "exceeded ... 60% of [plaintiff's] adjusted predisability earnings[]" and "exist in reasonable numbers within [plaintiff's] labor market." Id.[3]

On June 17, 2020, defendant received an "appeal request" for the LTD denial. AR604; see also AR774. In the letter acknowledging the appeal, defendant stated that it would "have a decision on [plaintiff's] appeal no later than August 1, 2020." AR605.

Defendant sent a letter to plaintiff's counsel dated July 24, 2020, stating that it was "in the process of reviewing [plaintiff's] appeal, but" was not "ready to make a decision

---

[3] There appears to be a discrepancy between the percentages referenced in the LTD Policy and the December 20, 2019, letter. Compare AR140, with AR600. The parties do not raise any concerns with this in their briefing. Accordingly, the Court does not address this discrepancy.

5

yet." AR606. With that letter, defendant sent plaintiff's counsel "some information so that [he could] review it." Id. The letter stated: "You have 21 days from the date of this letter, or until August 13, 2020 to look over that information and decide if you want to respond. ... We'll wait to hear back from you and continue our review either when you send us more information, or by **August 13, 2020,** whichever comes first." Id. The letter further stated: "Once we continue our review, we expect to have our decision by **August 22, 2020**. We may need more time beyond that date if we get more information[.]" Id.; see also AR634 (email from an Appeals Specialist stating: "Our appeal review has been placed on hold until August 13, 2020. Unless Daniel advises us that additional time is needed, we'll make a decision by August 22, 2020.").

On August 6, 2020, plaintiff's counsel sent a letter to defendant stating that he had just received defendant's July 24, 2020, letter on August 5, 2020. See AR711. Plaintiff's counsel requested "21 days from" August 5, 2020, "to obtain additional evidence in support of [plaintiff's] disability. This would make the new deadline for us to provide you responses August 26, 2020." Id.

Defendant sent plaintiff's counsel another letter dated August 14, 2020. See AR647-48. This letter stated:

We can't make a decision on your client's ... appeal right now. We want to make sure your client has the same information we do, so that we can have an ongoing good faith exchange of information during this process.

We received your August 6, 2020 letter in response to the peer review report that was mailed to you on July 24, 2020. In your letter, you asked for additional time to obtain responses from your client's physicians – which we have approved.

We'll wait to hear back from your client and continue our review either when your client send us more information, or by August 26, 2020, whichever comes first.

...

Once we can continue our review, we expect to have our decision by **September 4, 2020.**

AR648.

Plaintiff's counsel then sent two letters to defendant, both dated August 26, 2020. See AR709, AR685-86. One acknowledged the August 26, 2020, deadline to provide evidence in response to defendant's July 24, 2020, letter but requested "7 additional days from [August 26, 2020,] to submit [plaintiff's] response. The new deadline to submit the response would be September 2, 2020." AR709. The second letter stated:

As we have now provided the additional evidence we were planning on submitting, please proceed with reviewing this claim for a decision. Based on our having submitted the appeal on June 17, 2020, [defendant] had been reviewing the appeal for 43 days when it mailed the information it provided for us to respond to (while the enclosing letter was dated July 24, 2020, the postmarked date on the envelope was July 30 (postmarked envelope attached), so the letter was not sent by [defendant] until July 30 and that is the appropriate date for the

> tolling to begin under the ERISA Regulations).
> Accordingly, [defendant] has 2 remaining days (or August
> 28, 2020) to either make a decision or request an
> extension under the deadlines provided by ERISA's
> Regulations.

AR686.

Defendant sent plaintiff's counsel a letter dated September 3, 2020, stating: "We can't make a decision on your client's ... appeal right now because a vocational review needs to be completed given the additional vocational information provided with your August 26, 2020 letter. We need an additional 45 days to make our decision. ... We should have a decision before **October 19, 2020**." AR649.

Defendant next sent a letter to plaintiff's counsel dated September 11, 2020. See AR650. This letter provided plaintiff with a "Rehabilitation Transition Review summary" completed by Stephanie Farland, a "Vocational Rehabilitation Consultant." Id. Defendant provided 21 days for plaintiff to review that information and decide whether to respond. See id. The letter stated that defendant would wait to hear back from plaintiff, and then continue its review upon receiving additional information from plaintiff, or by September 30, 2020, whichever was earlier. See id. The letter stated that defendant "expect[ed] to have [a] decision by **November 9, 2020**." AR651.

By letter dated October 5, 2020, defendant upheld the denial of plaintiff's LTD claim. See AR2699-2702. In relevant

part, defendant "found that the clinical evidence fails to
support impairment that would preclude [plaintiff] from
performing <u>any occupation</u> as of December 19, 2019." AR2701
(emphases added); <u>see also</u> AR2700-01 (plaintiff's restrictions
as found by Dr. Grattan "[a]fter a review of the medical records
on file combined with the discussion of Dr. Ortega"). The letter
also noted that a "Vocational Rehabilitation Consultant (VRC)"
had "reviewed the updated restrictions and the November 18,
2019, test change review. The VRC opined that the alternative
occupations identified in the November 18, 2019 [Employability
Analysis] report were still viable occupations." <u>Id.</u>

   B.   <u>Diagnosis and Treatment</u>

   NMO is

> a central nervous system disorder that primarily affects
> the eye nerves (optic neuritis) and the spinal cord
> (myelitis). ... It occurs when [the] body's immune
> system reacts against its own cells in the central
> nervous system, mainly in the optic nerves and spinal
> cord, but sometimes in the brain.
>
> ...
>
> Neuromyelitis optica can cause blindness in one or both
> eyes, weakness or paralysis in the legs or arms, painful
> spasms, loss of sensation, uncontrollable vomiting and
> hiccups, and bladder or bowel dysfunction from spinal
> cord damage.

Doc. #54 at 7-8;[4] <u>see also</u> AR1169.

---

[4] The Court's citations to documents, except for the
administrative record [Doc. #51], refer to the page numbers
reflected in the document's ECF heading.

Plaintiff first exhibited symptoms of NMO in 2009, when he was hospitalized after an acute demyelinating attack. See STD625-27. In 2009, plaintiff reported symptoms including: leg cramps when walking; incontinence; and numbness or shooting pain in the extremities. See STD553. After several lengthy hospital stays in 2009, during which plaintiff suffered from paralysis and extreme pain, plaintiff began a chemotherapy regimen (Rituxin) to help prevent the recurrence of future acute demyelinating attacks. See generally STD535-76; STD621-659; STD1258-74; see also AR2490. Plaintiff has since received semi-annual infusions of Rituxin, which enabled him to work until July 2017 with "base line residual symptoms since his demyelinating episodes." PW457; see also AR2490. Since 2009, plaintiff has treated his NMO with a number of specialists.

    *1.   Mental Health*

For mental health symptoms, plaintiff saw Dr. Pierre André, who treated plaintiff with various prescription medications including Adderall and Klonopin. See STD409, AR2035, AR2037. Mental status examinations conducted by Dr. André in 2016 and 2017 were unremarkable. See STD414, STD416, STD418, STD422, AR1692-94, AR1700-02. On May 5, 2017, Dr. André noted that plaintiff was "stable[.]" STD414. The recurring theme throughout Dr. André's 2017 treatment notes was plaintiff's worries over business and legal issues. See STD412, STD416, STD418.

In September 2018 plaintiff "had a ketamine infusion for anxiety [and] depression" and reported that he had been prescribed Wellbutrin and Lexapro by another doctor. AR2055. In October 2018, plaintiff was "more stable" but "still depressed[.]" AR1686. Plaintiff's mental status exams during this time were unremarkable. See AR2053-55.

Dr. André's progress notes in 2019 reflected that plaintiff was then "stable." AR877, AR878, AR2046-47, AR2049. Plaintiff's mental status exams during this time were unremarkable. See id.; see also AR2050-51.

> 2.   Neurology

Following his initial NMO diagnosis, plaintiff primarily treated with Dr. William Sheremata, a neurologist with the University of Miami Health System. See STD1523. Treatment notes from 2013, 2014, and 2015, reflected plaintiff's "slightly wide gait[,]" normal strength, a "complete absence of proprioception at the left great toe and ankle[,]" and an absence of "[v]ibration sense ... below the left knee[.]" AR1119; see also AR1120-1133.

Plaintiff began treating with neurologist Dr. Melissa Ortega in October 2017. See STD1523; see also STD328. Dr. Ortega first saw plaintiff on October 11, 2017. See AR1018. Dr. Ortega noted: "At baseline he has loss of proprioception in the left foot and a chronic stabbing pain in the left leg that is

minimally responsive to narcotics anymore." AR1019. A neurological exam on this date was largely unremarkable except that plaintiff exhibited "[d]ecreased [sensation] in left leg from waist down. No proprioception in left great toe. ... Romberg sign absent. Gait is mildly wide based." AR1020. Dr. Ortega noted plaintiff's "remarkable recovery and [that] his disease has been controlled on rituximab. He does have chronic baseline symptoms of decreased sensation, mild difficulty with balance, ... chronic neuropathic pain and urinary symptoms." Id.

On November 14, 2017, plaintiff reported concerns of progressing NMO symptoms. See STD328. A neurological exam on this date was similar to that of October 11, 2017, except the "Romberg sign shows sway with eyes closed. Gait is mildly wide based and slower ... compared to last visit[.]" STD330. Dr. Ortega noted that plaintiff "has had baseline residual symptoms since his initial demyelinating episodes. However, he has had significant progression in his symptoms over the past year." Id.

Dr. Ortega's November 14, 2017, assessment noted that an "MRI of the thoracic cord from 11/15/2017 compared to prior imaging show[ed] 'New areas of volume loss involving the midthoracic spine[.]'" Id.[5] Dr. Ortega concluded that plaintiff's

> symptoms, exam and imaging suggest a progressive
> myelopathy with worsening gait, balance, urinary and

---

[5] An MRI of plaintiff's brain and orbits taken on December 6, 2017, was "unremarkable." AR2602.

sexual dysfunction, sensory loss and neuropathic pain. This suggests he has a type of neuromyelitis optica that is likely entering a secondary progressive clinical course which has been described in the past.

STD330-31. Dr. Ortega also noted plaintiff's "complaints of poor concentration[.]" STD331. Dr. Ortega stated that plaintiff was "disabled from neuromyelitis optic and will continue to neurologically decline[.]" Id.

Plaintiff next saw Dr. Ortega on February 1, 2018, at which time he reported that he continued "to not feel well." STD334. Plaintiff reported "constant stabbing pains in his legs[,]" "severe fatigue[,]" "some episodes of incontinence[,]" and "poor concentration[.]" Id. Dr. Ortega's report of her examination of plaintiff on this date was nearly identical to her report of the November 14, 2017, examination. See STD335.

Plaintiff next saw Dr. Ortega on May 15, 2018. See AR2601-02. Plaintiff continued to complain of "severe chronic fatigue[]" and "constant stabbing pains in his legs that do not respond to treatment." AR2602. Plaintiff also reported "poor concentration[.]" Id. The report of Dr. Ortega's examination of plaintiff on this date remained largely unchanged from that of the February 1, 2018, examination. See AR2604; see also PW585. Dr. Ortega recommended that plaintiff continue with the "Rituxin infusions every 6 months." AR2604.

Plaintiff next saw Dr. Ortega on December 4, 2018. See AR907. Plaintiff's "main complaint [was] chronic fatigue and neuropathic pain." AR908. Plaintiff reported his belief "that the majority of baseline symptoms ha[d] remained stable since last visit." Id. (sic). Dr. Ortega's report of her examination of plaintiff on this date was similar to those of previous examinations, except that plaintiff's gait was now "slow and cautious." AR909. Dr. Ortega concurred that plaintiff "seem[ed] to be stable since last visit." Id. (sic).

On February 9, 2019, plaintiff appeared for an appointment with Dr. Ortega accompanied by his wife, who reported her concerns about plaintiff's memory. See AR795. Dr. Ortega's examination of plaintiff on this date again reflected plaintiff's decreased sensation "in left leg from waist down" and "[n]o proprioception in left great toe." AR797. Plaintiff also exhibited "mild dysmetria bilaterally," and "mild dyskdiadokinesis with rapid alternating movements[.]" Id.

Plaintiff next saw Dr. Ortega on October 29, 2019. See AR884. The treatment note for this visit is substantially similar to that for the February 9, 2019, visit. See generally AR884-87. Dr. Ortega noted that plaintiff was "neurologically stable since last visit." AR887.

14

3.   *Pain Management*

For pain management, plaintiff treated with Dr. David Berkower. See STD350-73, STD1276, STD1550-62; see also PW409-16, PW477-500.

The first record of plaintiff's treatment with Dr. Berkower is dated February 24, 2017. See STD1560-62. During this visit, plaintiff complained that his pain had not been well controlled with medication. See STD1560. On examination, plaintiff "demonstrated a mildly antalgic gait[,]" but "[t]he range of motion in the lumbar spine [was] within functional limits." STD1560-61. Other than no proprioception in plaintiff's left leg and a loss of proprioception in plaintiff's left foot, Dr. Berkower's physical examination of plaintiff was largely intact. See STD1561. Plaintiff's treatment with Dr. Berkower on April 5, 2017, and June 28, 2017, reflected similar complaints and findings on examination as those recorded on February 24, 2017. See STD1557-59, STD1554-56.

During plaintiff's August 22, 2017, visit with Dr. Berkower, plaintiff stated that "the chemotherapy has made him very tired[]" and that he did "not feel he can work and wants to take some time off for at least six months." STD1550. Dr. Berkower's report of his examination of plaintiff on this date reflected findings similar to those previously recorded. See STD1551.

15

Plaintiff next saw Dr. Berkower on September 18, 2017, at which time plaintiff reported that "[t]he belbuca 750mcg does help him." STD370. Plaintiff reporting feeling "very tired[,]" with "clouded thinking[.]" Id. Plaintiff also stated that he experienced "chronic pain mainly in his left leg[,]" "numbness in both legs all the time[,]" and "pain in his eyes especially when working on his computer." Id. Dr. Berkower's report of his examination of plaintiff on this date reflected findings similar to prior examinations. See STD371.

The progress notes of plaintiff's visits with Dr. Berkower on October 16, 2017, November 7, 2017, and December 29, 2017, reflected findings similar to the September 18, 2017, progress note. See STD366-68, STD362-65, STD358-61, AR852-73.

Plaintiff saw Dr. Berkower on January 22, 2018, and complained that "[h]is pain has not been well controlled. The belbuca 900 mcg does help him but not enough." STD354 (sic). Plaintiff's other complaints largely remained the same as those recorded in 2017. See id. Dr. Berkower's report of his examination of plaintiff on this date reflected findings similar the 2017 physical examinations. See STD355.

Plaintiff next saw Dr. Berkower on February 6, 2018. See STD350. During this visit, plaintiff complained that "[h]e cannot focus with his belbuca 1200mcg. However, it helps him a great deal with his pain. He also has bladder incontinence twice

16

a week. His balance is poor and can't put on normal shoes. He is in bed most of the day secondary to the pain." STD350 (sic). Dr. Berkower's report of his examination of plaintiff on this date reflected findings similar to prior examinations. See STD351

The next record of plaintiff's treatment with Dr. Berkower is dated more than fifteen months later, on May 13, 2019. See PW413. Plaintiff's complaints during this visit reiterated those made during the February 6, 2018, visit. See id. At this time, plaintiff remained on 1200mcg of Belbuca. See id. Dr. Berkower's report of his examination of plaintiff on this date reflected findings similar to prior examinations. See PW414.

The progress notes from plaintiff's visits with Dr. Berkower on July 23, 2019, October 29, 2019, and March 20, 2020, are substantially similar to that for the May 13, 2019, visit. See PW409-11; AR852-54; AR866-68.

    4.   *Urinary Incontinence*

For his complaints of incontinence, plaintiff met with a urologist, Dr. Charles M. Lynne, on December 14, 2017. See STD406. During this appointment, plaintiff reported "that of over the past 6 months, he gets occasional episodes of precipitous urgency and urge incontinence." Id. (sic). Plaintiff was "not very receptive to the idea of really any testing[,]" but agreed to an ultrasound of his kidneys and bladder. Id.

17

In May 2018, plaintiff reported to Dr. Ortega that despite his complaints of "urinary urgency," plaintiff did "not want further testing with the urologist." PW590.

On February 25, 2020, plaintiff saw Dr. Satyanarayana Konanur for complaints "of days with urge incontinence, where he has to rush to get to the bathroom in time before he leaks urine." AR2063. Plaintiff reported the incontinence to be "sporadic[.]" Id. A physical examination on this date reflected: the presence of a sensory deficit; motor weakness; and abnormalities in plaintiff's gait, coordination and deep tendon reflexes. See AR2068. Plaintiff was started on a trial of "anticholinergics." AR2069.

C.    Treating Physician Opinions & Plaintiff's Other
       Medical Evidence

Plaintiff's treating physicians provided opinions and other statements in support of plaintiff's claim for benefits. This evidence is summarized below.

1.   Dr. André

Dr. André completed an "Attending Provider Statement" dated August 29, 2017, which stated, in relevant part, that plaintiff "can not sit or stand for very long" and noted plaintiff's chronic fatigue "due to Devic's Disease[.]" STD1525 (sic). Dr. André did not comment on plaintiff's mental functional capacity.

Dr. André completed an "Attending Physician's Statement" in 2019. See AR2157. Included in that statement is a "Current Mental Status Examination[.]" Id. In relevant part, Dr. André found plaintiff to have, as of October 9, 2019, a depressed mood, and impaired concentration and memory. See id. Dr. André opined that plaintiff's symptoms were severe enough to "preclude [plaintiff] from social/occupational functioning[.]" AR2158 In response to the question, "What are your patient's current abilities?" Dr. André stated: "None." Id.[6]

### 2. Dr. Ortega

On October 18, 2017, Dr. Ortega submitted a letter on plaintiff's behalf stating that plaintiff was "not only incapable of working at his former job, but incapable of working at any job[]" because of: "Memory loss, Fatigability, on/off motor fluctuations, lower extremity spasticity loss of coordination and walking difficulties[.]" STD1413. Dr. Ortega noted the "progressive" nature of plaintiff's condition in this letter. Id.

Dr. Ortega completed a Medical Opinion Form dated February 26, 2018, stating in relevant part that plaintiff suffered from "[e]xtreme" pain that "would interfere with his ... reliably

---

[6] This opinion diverges from Dr. André's contemporaneous treatment notes, which make no refence to impaired memory or concentration. See AR877, AR878, AR2049, AR2049.

attending" a regular work week, and would also interfere with his concentration or memory "daily for several hours a day[.]" STD326.

On February 28, 2018, plaintiff's counsel conducted a "telephonic sworn statement" of Dr. Ortega. AR2485. As of that date, Dr. Ortega had seen plaintiff on just three occasions. See AR2491. Dr. Ortega described plaintiff's "main" symptoms of Devic's Disease as: "[H]e has loss of balance. He has some loss of sensation in his lower extremities. He has severe chronic nerve pain in his legs. He has increased urinary urgency and episodes of urinary incontinence. He has erectile dysfunction. He's had some chronic fatigue. He's complained of poor concentration." Id. Dr. Ortega opined that recent examinations of plaintiff suggested that "there may be underlying progression of his disease[.]" AR2494. Dr. Ortega also noted that the limited sensation in plaintiff's left leg had "been a long-standing symptom ... since he first had his attack." AR2498. Dr. Ortega reiterated her opinion that plaintiff would not be able to maintain 40-hour per week employment due to his chronic pain, incontinence, and inability to concentrate. See AR2500-01.

In a July 2018 sworn statement, Dr. Ortega confirmed that the November 2017 MRI was, in her opinion, "objective evidence of the progression of [plaintiff's] disease[.]" PW584.

Dr. Ortega responded to a letter from plaintiff's counsel dated February 24, 2020, confirming that "the restrictions and limitations on the Medical Opinion Form dated February 26, 2018, still accurately represent Mr. Khesin's abilities." AR848.

### 3. Dr. Berkower

Dr. Berkower submitted two letters on behalf of plaintiff. The first letter is dated August 23, 2017, and stated: Plaintiff "has ongoing disability with total lack of proprioception in his left leg and chronic pain. ... He has had worsening pain with his Rituxin chemotherapy treatments. He requires chronic pain medications that also affects him mentally. On account of this, I feel he is unable to work at this time." STD1276 (sic). The second letter is dated October 12, 2017, and stated, in relevant part, that Dr. Berkower did "not anticipate that [plaintiff] will improve to the point of being able to return to work in the foreseeable future, if ever." STD1414.

Dr. Berkower completed an "Attending Provider Statement" dated August 28, 2017. STD1359. Dr. Berkower stated that plaintiff "cannot sit or stand for very long. He suffers from chronic fatigue and pain. He has difficulty driving + walking. Mentally he has difficult time focusing. He can do activities for a short period of time." Id. Plaintiff's treatment plan included, in addition to medication, "Exercise Daily at Home." Id. (sic).

21

Dr. Berkower completed a Medical Opinion Form dated March 18, 2018, stating that plaintiff suffered from "Moderately Severe" pain that "would interfere with his ... reliably attending" a regular work week, and would also interfere with his concentration or memory "daily for several hours a day[.]" PW614 (sic).

Three days later, on March 21, 2018, plaintiff's counsel conducted a "sworn statement via telephone" of Dr. Berkower. STD338. During this interview, Dr. Berkower noted that plaintiff had recently been experiencing "increased pain and difficulty concentrating," which "kep[t] him on the pain medications[.]" STD341. Dr. Berkower stated that plaintiff was then taking Belbuca for pain, and Oxycodone for break-through pain. See STD342. Dr. Berkower stated that plaintiff's "pain level waxes and wanes[]" between moderate and severe, but that "the pain medications ... allow[] the pain level to significantly stabilize," STD343, such that plaintiff is "able to live his life[.]" STD344. Dr. Berkower concluded: "I think with the waxing and waning and the incontinence, the concentration issues, the fatigue issues, I just don't see how he would be able to function on a 40-hour type job on a regular basis." STD346-47 (sic).

Dr. Berkower responded to a letter from plaintiff's counsel dated February 25, 2020, confirming that "the restrictions and

limitations on the Medical Opinion Form dated March 19, 2018, still accurately represent Mr. Khesin's abilities." AR874.

### 4. *Dr. Craig Lichtblau*

Dr. Craig Lichtblau prepared a "Comprehensive Rehabilitation Evaluation" dated May 15, 2019. PW686-818. This report contains a medical evaluation, which includes a comprehensive medical history and the results of a physical examination. See PW687-92. On examination, plaintiff ambulated with a normal gait; had decreased proprioception in his left foot; and a positive Romberg sign with his eyes closed. See PW691-62. Otherwise, the examination was largely unremarkable. See id. Dr. Lichtblau also performed a "Medical Functional Capacity Assessment" as part of his report. PW695; see also PW696-PW730.

Following the assessment, Dr. Lichtblau completed a "Medical Functional Capacity Opinion[.]" PW732. The opinion noted that during the assessment, plaintiff "was able to maintain concentration adequately." PW733. Dr. Lichtblau stated his

> belief that Daniel Khesin does not have the functional capacity to work 4 hours per day on an uninterrupted basis at this time. He should be in a setting which allows him to take breaks to change positions from sit-to-stand/stand-to-sit frequently at will for positional comfort. He may sit, stand, and walk as tolerated.
>
> The patient may perform bending, twisting, climbing protected heights (i.e. stairs with rails and ramps with

23

rails), repetitive reaching overhead, repetitive movements of elbow (handling), pushing and pulling.

The patient should avoid repetitive bending, kneeling, squatting, crawling, climbing unprotected heights (i.e. ladders, poles, and scaffolding), running, and jumping.

This patient should always observe appropriate body mechanics which includes, but is not limited to, never bending at his waist while keeping his hips and knees extended.

The Medical Functional Capacity Assessment conducted on Daniel Khesin's behalf indicates an estimated residual physical functioning strength level from the hips-to-shoulders position to be Sedentary Light as defined by the U.S. Department of Labor.

It should be understood this patient is going to suffer from acute, intermittent exacerbations of pain and discomfort and, when he/she experiences acute, intermittent exacerbations of pain and discomfort, he/she will have good days, bad days, and missed days of work.

It is my medical opinion as a Board Certified Physiatrist that this patient will not be able to maintain gainful employment in the competitive open labor market or in a sheltered environment with a benevolent employer secondary to acute, intermittent exacerbations of chronic pain.

PW733-34.

    *5.   Independent Medical Examination*

On April 23, 2020, Dr. Kashyap Patel conducted an independent medical examination ("IME") of plaintiff at the request of plaintiff's counsel. See AR1163. To prepare this report, Dr. Patel reviewed records provided by plaintiff's counsel, and "conducted an interview with [plaintiff] via video conference[.]" Id. In addition to reviewing plaintiff's medical

records and the opinions of Dr. Berkower and Dr. Ortega, Dr. Patel "reviewed records from ... Dr. Critchfield, Dr. Emad and Dr. Snyder." AR1166. Dr. Patel concluded that plaintiff was "unable to work and that his disabling condition is permanent." Id. Dr. Patel agreed "with the opinions expressed by Dr. Ortega and Dr. Berkower's in their sworn statements." AR1167 (sic). Dr. Patel opined:

> The claimant has fixed permanent disability which needs lifelong treatment with significantly potent medicine with ongoing side effects. Due to the disease itself and the ongoing treatment, he has significant limitations on his physical and mental ability to perform meaningful work, including sedentary work.

AR1167.

### 6. *Social Security Disability Insurance Benefit Claim*

Plaintiff filed an initial claim for Social Security Disability Insurance Benefits ("SSDI") on April 18, 2018. See AR1179. Plaintiff's SSDI claim was denied upon initial review, see AR1179-87, and upon reconsideration, see AR1200-1212. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), who, after holding a telephonic hearing, determined that plaintiff had "been under a disability as defined in the Social Security Act since July 13, 2017[.]" AR2098; see also AR2094-98 (June 8, 2020, ALJ decision). The ALJ based his decision on plaintiff's "severe impairments[]" of: "neuromyelitis optica/Devic's disease; degenerative changes of the thoracic and

lumbar spine; neurogenic bladder with intermittent urinary urgency; anxiety disorder; depressive disorder; and attention-deficit/hyperactive disorder (ADHD)[.]" AR2094.

D.   Peer Review Evidence

Defendant engaged several consultants to conduct peer and clinical reviews of plaintiff's records.

1.   Dr. Snyder

On November 21, 2017, Dr. Michael D. Snyder, a specialist in neurology, conducted a Physician Review of Claim Data on behalf of defendant. See STD459-468. In addition to reviewing plaintiff's medical and other records, Dr. Snyder spoke with Dr. Berkower and Dr. Ortega, each of whom reiterated the opinion that plaintiff was unable to work in any capacity. See STD464-65.

Following his review, Dr. Snyder concluded: "There is no clinical evidence to support a functional impairment which would preclude the claimant from performing any activity, effective 7/13/2017 to present[.]" STD466. Specifically, Dr. Snyder concluded that plaintiff "would be expected to be capable of full-time employment with restrictions and limitations." Id.

Dr. Snyder reasoned, in relevant part, that plaintiff "had remained functional and employed for several years with [his] symptoms, and there is no objective documentation from the submitted clinical records that his condition has appreciably

26

changed recently to render him impaired." STD467; see also id.
("[F]rom the clinical information, these deficits have been
static and not progressive, and the claimant had progressively
remained employed for several years with these deficits."). Dr.
Snyder also "noted" plaintiff's "reports of chronic fatigue and
cognitive symptoms[,]" but found that such complaints were "not
substantiated by objective findings or documentation." STD466.

### 2. Dr. Critchfield

On November 19, 2018, Dr. Eden Critchfield, a specialist in
neuropsychology, completed a Physician Review of Claim Data on
behalf of defendant. See PW245-54. Dr. Critchfield found that
"[t]he available medical records indicate the claimant's
difficulties with concentration and psychiatric symptoms are
longstanding, and present during time periods when the claimant
has been able to maintain employment." PW253. Accordingly Dr.
Critchfield concluded: "From a neuropsychology perspective, the
available medical records do not support cognitive or
psychiatric symptoms of a severity to result in any functional
impairment or that would impede his ability to work 8 hours per
day/40 hours per week." PW254 (sic).

### 3. Dr. Emad

On November 19, 2018, Dr. Behzad Emad, who is board
certified in physical medicine and rehabilitation, completed a
Physician Review of Claim Data on behalf of defendant. See

PW256-66. As part of his review, Dr. Emad spoke with Dr. Ortega on November 16, 2018, who "**agreed that [plaintiff] has the capability to perform full time duty with the provided restrictions and limitations**." PW263 (emphasis added).

Dr. Emad concluded that plaintiff was "able to sustain full time duty, 8 hours per day, 5 days per week with permanent restrictions and limitations from 7/13/2017 through 10/12/2017 and from 10/13/2017 forward." PW263; see also PW263-64 (listing limitations and restrictions). Dr. Emad explained: "[T]here is no documentation indicative of an incapacitating physical limitation that would preclude the claimant from perform fulltime duty." PW264 (sic).

### 4. Dr. Kroski

Dr. William J. Kroski, who is board certified in physical medicine and rehabilitation, with a subspecialty certificate in pain medicine, completed a Physician Review of Claim Data on appeal. See PW821-27. As part of his review, Dr. Kroski spoke with Dr. Berkower on July 15, 2019. See PW824. Dr. Berkower did not agree that plaintiff could return to work with restrictions. See PW825. Dr. Kroski did not speak with Dr. Ortega, who was "out of the country[.]" PW824.

After identifying "reasonable restrictions and limitations[,]" PW825, Dr. Kroski concluded that plaintiff "would be expected to sustain fulltime capacity over an eight

28

hour workday for 40 hours per week for the time period of 7/13/17 and beyond." PW826. However, "[d]ue to the progression of his symptoms," Dr. Kroski stated that "it would be reasonable to re-evaluate" the assigned limitations and restrictions in four to six months from the date of his review. Id.

### 5. Dr. Hertza

Dr. Jeremy Hertza, a specialist in clinical neuropsychology, also completed a Physician Review of Claim Data on behalf of defendant. See PW829-37. Dr. Hertza concluded: "Given unremarkable mental status exams, no formal assessment, and no indication of high level psychological or cognitive related care, I find that the available medical record does not support functional impairment, from a neuropsychological perspective, from 7/13/2017 through present." PW835. Dr. Hertza determined that plaintiff "would be expected to have sustained capacity in at least 3 consecutive hours per day for the time period of ... 7/13/2017 and beyond." Id.

### 6. Dr. Spilker

On July 15, 2020, Dr. Courtney C. Spilker, a specialist in neuropsychology, completed a Physician Review of Claim Data on behalf of defendant. See AR609-19. As part of this review, Dr. Spilker unsuccessfully attempted to consult with Dr. André. See AR615.

Dr. Spilker concluded: "For the period under review, as of 12/21/19, there is no documentation from providers which suggests objective cognitive impairment (absence of neuropsychological evaluation) or subjective provider observations of cognitive impairment resulting in functional impairment." AR618-19.

       7. *Dr. Grattan*

On July 20, 2020, Dr. Howard Grattan, a specialist in physical medicine, rehabilitation, and pain management, also conducted a Physician Review of Claim Data on behalf of defendant. See AR620-33. As part of this review, Dr. Grattan attempted to consult with Dr. Berkower, who had "nothing further to add[.]" AR629. On July 10, 2020, Dr. Grattan spoke to Dr. Ortega who "reported that the claimant has significant pain and balance issues secondary to the demyelinating disease he has had in the past[.]" AR630.

Dr. Grattan "agree[d] that [plaintiff] does have significant limitations, however, there is not clear evidence of cognitive change that would completely prevent his ability to function and he is neurologically stable. He is at risk for falls given reported balance issues, however, this would not impact functioning with appropriate restrictions in place." AR631.

30

Dr. Grattan opined:

> From 12/21/19 forward, and from a physical medicine and pain perspective, medically necessary restrictions throughout an 8 hour day, and 40 hour week include:
>
> Lifting, carrying, pushing and pulling 10 pounds occasionally (up to 1/3 of the day) and 5 pounds frequently (1/3 to 2/3 of the day). Sitting 60 minutes continually and up to 6 hours per 8 hour day. Walking and standing combined 10 minutes continually and up to 2.5 hours out of an 8 hour day. Occasionally (up to 1/3 of the day) twisting, bending, kneeling, crouching, squatting, and climbing stairs. No climbing ladders or poles, working at heights, or operating heavy machinery. No crawling or balancing. Occasionally (up to 1/3 of the day) reaching below the waist or overhead/above shoulders. No restrictions with reaching at waist/desk/bench level. Use of upper extremities for fingering, handling, feeling, and grasping is unrestricted. The claimant should be given the opportunity to have access to a bathroom when needed due to the symptoms of neurogenic bladder.

AR631.

### E.   Vocational Evidence

#### 1.   *Vocational Evaluation by Mark Boatner*

Mark Boatner, M.Ed., CRC, completed a Vocational Evaluation dated July 6, 2018. See PW616-23. To prepare this evaluation, Mr. Boatner relied on evidence supplied by plaintiff's attorney. See PW616.

Mr. Boatner first conducted "a detailed occupational analysis to determine [plaintiff's] pre-disability occupation[.]" PW616-17; see also PW616-619. Mr. Boatner concluded that plaintiff's "occupation when his disability began was that of, 'Chemical Laboratory Chief ... SVP 8, skilled;

light strength'." PW618. Mr. Boatner reviewed "the restrictions Aetna has found reasonable[,]" PW619, and concluded that plaintiff was "not capable of returning to the last job that he held[.]" PW620.

Mr. Boatner also "review[ed] the opinions of Drs. Berkower and Ortega and provide[d his] vocational opinion about whether [plaintiff] could return to his previous occupation with the restrictions they provide." Id. Based on Dr. Berkower's Medical Opinion Form, Mr. Boatner concluded that "a person limited to the extent and in the ways described by [Dr. Berkower] could not be reasonably capable or able to meet expectations of any full-time or part-time job including his immediate or other past relevant work as well as all of the entry level jobs." PW620-21.

Similarly, based on the Medical Opinion Form completed by Dr. Ortega, Mr. Boatner concluded that plaintiff "would be unable to perform any of his past relevant work or to perform any regularly defined full-time or part-time job that exists in the national economy." PW621.

Mr. Boatner concluded that plaintiff

> does not retain the physical and/or cognitive capability necessary to sustain his past highly complex and detailed job or any, regularly defined job that requires attention, meeting production rate norms and attending on a full-time, 8-hour a day, 40-hour a week basis for 52 weeks a year. Furthermore, he does not possess the necessary physical demand characteristics to perform any regularly defined semiskilled or unskilled job that exists in the national economy.

PW623.

### 2.  Defendant's Employability Analysis

On November 18, 2019, defendant had "[a]n Employability Analysis" conducted to determine plaintiff's "current employability[] ... based upon his functional capabilities, education, training and work history." AR2166. The results of that analysis yielded a "representative sample of occupations that meet [plaintiff's] profile[], including: (1) "Manager, Data Processing[;]" (2) "Manager, Computer Operations[;]" (3) "President[;]" (4) "Vice-President[;]" and (5) "Manager, Department[.]" AR2168.[7] Additionally,

> Based on wage information for Standard Occupation Classification (SOC) groups reported in the 2017 National OES Wage Statistics, the mean monthly wages for the identified occupations range from $12,478.27-$16,336.67/month and all meet or exceed the required earnings potential of $11,878.56/month.

Id.

### 3.  Vocational Report by Andrea Bradford

Plaintiff engaged Andrea Bradford, a "Certified Rehabilitation Counselor (CRC) and Vocational Assessment Specialist[,]" "to provide an opinion regarding [plaintiff's]

---

[7] The Employability Analysis Report predated Dr. Grattan's peer review. Compare AR2166, with AR672. A Vocational Case Manager reviewed the Employability Analysis Report and Dr. Grattan's peer review. See AR658. Based on that review, the Vocational Case Manager concluded: "[T]he alternative occupations identified in the 11/18/2019 report [are] still viable occupations. There are no changes to this review." Id.

vocational capacities." AR668. In arriving at her opinion, Ms. Bradford reviewed medical records including the opinions of Dr. Ortega, Dr. Berkower, Dr. Lichtblau, and Dr. Patel. See AR670-671; see also AR675. She also reviewed the opinion of Dr. Grattan and defendant's Employability Analysis report. See AR671, AR673, AR675.

Ms. Bradford noted that defendant's Employability Analysis predated Dr. Grattan's review and did not incorporate all of the restrictions and limitations he identified, including those related to bathroom access, severe neurogenic pain, and poor concentration. See AR672. Ms. Bradford found that plaintiff would be unable to perform any of the occupations set forth in defendant's Employability Analysis Report because of plaintiff's chronic pain, poor concentration, and neurogenic bladder. See AR672, AR673.

Ultimately, Ms. Bradford identified five representative occupations that plaintiff could perform, none of which were expected to earn more than $139,000 per year. See AR673. She opined that plaintiff "would, at the maximum, have the capacity to work part-time in a lesser skilled occupation that does not require any management or executive duties of any kind." AR674.

## II.  **Standard of Review**

A court will "review a plan administrator's decision de novo unless the plan vests the administrator with discretionary

34

authority to determine eligibility for benefits or to construe

the terms of the plan, in which case we use an abuse of

discretion standard." Nichols v. Prudential Ins. Co. of Am., 406

F.3d 98, 108 (2d Cir. 2005) (citation and quotation marks

omitted). Here, there is no dispute that the LTD Policy provides

Hartford with "discretionary authority to determine whether and

to what extent eligible employees and beneficiaries are entitled

to benefits and to construe any disputed or doubtful terms under

th[e] Policy[.]" AR73. However, plaintiff asserts that the Court

should review this matter de novo because defendant failed to

comply with the Department of Labor's regulations. See Doc. #54

at 17-18.

> [A] plan's failure to comply with the Department of
> Labor's claims-procedure regulation, 29 C.F.R.
> §2560.503-1, will result in that claim being reviewed de
> novo in federal court, unless the plan has otherwise
> established procedures in full conformity with the
> regulation and can show that its failure to comply with
> the claims-procedure regulation in the processing of a
> particular claim was inadvertent and harmless.

Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.,

819 F.3d 42, 58 (2d Cir. 2016). Thus, "the denial of a claim

under a plan including discretionary authority is not entitled

to the great deference afforded by the arbitrary and capricious

standard if the denial procedure failed to comply with

the Department of Labor's claims-procedure regulation[.]"

Schuman v. Aetna Life Ins. Co., No. 3:15CV01006(SRU), 2019 WL

2991958, at *2 (D. Conn. July 9, 2019). "[T]he plan bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it." Halo, 819 F.3d at 58 (citation and quotation marks omitted).

Plaintiff asserts that defendant's September 3, 2020, extension request "was made outside the 45 days it is allowed to make an appeals decision, even after tolling the deadline to allow Plaintiff to respond to updated peer reviews." Doc. #62 at 4; see also Doc. #54 at 17-18. Defendant contends, in pertinent part: (1) "the deadlines set forth in Section 503-1 have been modified during the pendency of the COVID-19 pandemic, pursuant to Disaster Relief Notice 2020-01[,]" Doc. #57 at 11; and (2) defendant did "not violate the timeline governing plaintiff's administrative appeal, and did not violate Halo[,]" id. at 14 (capitalizations altered).

Once an appeal of a disability determination is filed, a plan administrator has 45 days to render a decision. See 29 C.F.R. §2560.503-1(i)(1)(i), §2560.503-1(i)(3)(i). The plan administrator may request a single 45 day extension, but only if "the plan administrator determines that special circumstances ... require an extension of time for processing the claim." 29 C.F.R. §2560.503-1(i)(1)(i). When calculating these time periods,

the period of time within which a benefit determination
on review is required to be made shall begin at the time
an appeal is filed in accordance with the reasonable
procedures of a plan, without regard to whether all the
information necessary to make a benefit determination on
review accompanies the filing. In the event that a period
of time is extended as permitted pursuant to paragraph
(i)(1), (i)(2)(iii) (B), or (i)(3) of this section due
to a claimant's failure to submit information necessary
to decide a claim, the period for making the benefit
determination on review shall be tolled from the date on
which the notification of the extension is sent to the
claimant until the date on which the claimant responds
to the request for additional information.

29 C.F.R. §2560.503-1(i)(4).

The timeline of the parties' correspondence is critical to
a determination of whether defendant violated the Department of
Labor's regulations. The Court begins its discussion there.

Plaintiff's appeal request was made on June 17, 2020. See
AR604. The 45-day deadline by which defendant was to have made a
decision on plaintiff's appeal was August 1, 2020. See 29 C.F.R.
§2560.503-1(i)(1)(i), §2560.503-1(i)(3)(i); see also AR605.

Defendant sent a letter to plaintiff's counsel dated July
24, 2020. See AR606. Using the date on the letter, it had been
37 days since plaintiff's appeal, leaving defendant with eight
days to issue a decision or to request an extension. See 29
C.F.R. §2560.503-1(i)(1)(i), §2560.503-1(i)(3)(i). Plaintiff
contends, however, that the letter was not mailed until July 30,
2020, and that date should be used for purposes of any tolling
argument. See Doc. #54 at 17, n.2.

37

The Department of Labor's regulations require that "the period for making the benefit determination on review shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information." 29 C.F.R. §2560.503-1(i)(4). Defendant has not shown by a preponderance of the evidence that the July 24, 2020, letter was sent on that date. Rather, the evidence of record supports a finding that the July 24, 2020, letter was not sent until July 30, 2020. See AR663-64 (letter from plaintiff's counsel including a copy of the envelope in which the July 24, 2020, letter was sent, bearing the date of July 30, 2020). Accordingly, the deadline by which defendant was to have made a decision on plaintiff's appeal was tolled from July 30, 2020, through the date plaintiff was to have submitted additional information, August 13, 2020. See AR606; Tsagari v. Pitney Bowes, Inc. Long-Term Disability Plan, 473 F. Supp. 2d 334, 338 (D. Conn. 2007) ("When a Plan extends the time for deciding a claim due to the claimant's failure to submit necessary information to decide the appeal, the tolling period commences on the date when the Plan notifies the claimant that it is seeking the extension, and the tolling period continues until the claimant provides the necessary information.") Defendant therefore had just two days from August

38

13, 2020, to issue its decision or request an extension of time to do so.

On August 6, 2020, plaintiff's counsel sent a letter to defendant requesting an additional 21 days from August 5, 2020, that is until August 26, 2020, to submit additional evidence in support of plaintiff's disability. See AR711.

Defendant responded to this correspondence by letter dated August 14, 2020. See AR647-48. In relevant part, defendant approved plaintiff's request for additional time, and indicated that it would continue its review "either when your client send[s] us more information, or by **August 26, 2020,** whichever comes first." AR648. Defendant also notified plaintiff that once it continued its review, it expected to have a decision by September 4, 2020. See id.

On August 26, 2020, plaintiff's counsel sent defendant two letters. See AR709, AR685-86. One letter requested an additional seven days from the August 26, 2020, deadline to submit more information, making "[t]he new deadline to submit our response ... September 2, 2020." See AR709. Plaintiff fails to acknowledge this letter in his briefing.

The second letter, also dated August 26, 2020, purported to enclose plaintiff's additional evidence, namely Ms. Bradford's report, and requested that defendant "proceed with reviewing this claim for a decision." AR686. Plaintiff's counsel asserted

in that letter that defendant had just two days, or until August 28, 2020, to make a decision. See id. Given the conflicting information in these two letters, defendant attempted to contact plaintiff's counsel on August 27, 2020, for further clarification. See AR2989-90, AR2999. Two voicemails left for plaintiff's counsel went unreturned. See id.

A preponderance of the evidence supports a finding that the time period for defendant to make a decision on plaintiff's appeal or to request an extension of time was tolled through September 2, 2020. First, plaintiff explicitly requested defendant to toll the deadline until September 2, 2020, so that he could submit more information. See AR709. When pressed for clarification by defendant about this request, plaintiff's counsel chose not to respond. See AR2989-90, AR2999.

Second, plaintiff's August 26, 2020, fax with the second letter and evidence was incomplete. See AR2988 ("8/26/2020 ltr from attorney w/part of a VRC report from Andrea Bradford fax says it is 24 pages long; however only rec'd 16 pages"); AR684. It was therefore reasonable for defendant to hold the time period open for plaintiff to submit more information until September 2, 2020, the date requested by plaintiff. See Tsagari, 473 F. Supp. 2d at 338. Accordingly, based on the record, the tolling period ended on September 2, 2020, and defendant had

40

until September 4, 2020, to render its decision or request an extension of time.

By letter dated September 3, 2020, defendant requested an additional 45 days to make its decision "given the additional vocational information provided" with plaintiff's August 26, 2020, letter. AR649. There is no evidence of record to suggest that this letter was not sent on September 3, 2020. Accordingly, defendant's request for extension of time to render its decision was within the required 45 days, and therefore timely. See, e.g., Mayer v. Ringler Assocs. Inc., 9 F.4th 78, 88 n.6 (2d Cir. 2021) (The Second Circuit rejected the argument that Hartford violated 29 C.F.R. §§2560.503-1(i)(1), (3) where Hartford "provided timely notice with an updated expected benefit determination date and an explanation that it would need more than 45 days to process Mayer's claim because it was still awaiting information from the Employer needed to fully investigate Mayer's claim." (citation and quotation marks omitted)), cert. denied sub nom. Mayer v. Hartford Life & Accident Ins. Co., 142 S. Ct. 1120 (2022).

The record also supports a finding that defendant remained in regular contact with plaintiff's counsel and provided updated decision deadlines based on the good faith exchange of information between the parties. See Topalian v. Hartford Life Ins. Co., 945 F. Supp. 2d 294, 337 (E.D.N.Y. 2013) ("[T]he

41

weight of authority in the Second Circuit supports the application of arbitrary and capricious review where, as here, the plan administrator remains in regular contact with the benefits claimant and issues a decision prior to the commencement of federal litigation."). Defendant is therefore entitled to deferential review, and the Court "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009) (citation and quotation marks omitted).[8]

Under this deferential standard of review, the Court may reverse a "decision to deny ERISA benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." Id. at 83 (citation and quotation marks omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." Plitnick v. Fussell, 601 F. Supp. 2d 470, 478 (D. Conn. 2009) (citation and quotation marks omitted).

The Court's "scope of review is narrow[,]" and it may not "substitute [its] judgment for that of the insurer as if [the Court] were considering the issue of eligibility anew." Hobson

---

[8] In light of this finding, the Court does not reach defendant's argument regarding the Disaster Relief Notice.

574 F.3d at 83-84 (citation and quotation marks omitted).
Ultimately, the Court must determine whether Hartford "had a
reasonable basis for the decision that it made." Id. at 89
(citation and quotation marks omitted).

"It is an ERISA claimant's burden to establish an
entitlement to benefits, and administrators may exercise their
discretion in determining whether a claimant's evidence is
sufficient to support his claim." Whelehan v. Bank of Am.
Pension Plan for Legacy Companies-Fleet-Traditional Ben., 621 F.
App'x 70, 71-72 (2d Cir. 2015) (citation and quotation marks
omitted).

## III. **Conclusions of Law**

Plaintiff raises four issues on appeal: (1) based on the
evidence presented, plaintiff is disabled under the terms of the
LTD Policy; (2) defendant's decision is erroneous in light of
the SSDI decision; (3) defendant erred by relying on the
opinions of the non-examining peer review physicians over those
of plaintiff's treating physicians; and (4) even if defendant
were justified in relying on the opinion of its peer review
physicians, defendant's "decision is still fatally flawed from a
vocational standpoint." Doc. #54 at 18. In response to
plaintiff's arguments, defendant asserts that: (1) it
appropriately considered, and is not bound by, the opinions of
plaintiff's treating physicians; (2) defendant reasonably

43

considered Dr. Lichtblau's FCE report; (3) defendant reasonably considered the reports of Dr. Patel and Ms. Bradford; and (4) defendant reasonably considered, and is not bound by the findings of, the SSDI decision. See generally Doc. #57 at 17-30. Defendant also contends generally that substantial evidence supports its decision. See generally Doc. #53 at 30-40.

The Court first considers whether defendant appropriately considered the medical opinion evidence.

A.   Defendant Adequately Considered the Medical Opinion
     Evidence

Although plaintiff concedes that "[t]here is no 'treating physician rule'" applicable to ERISA claims, plaintiff nevertheless contends that defendant acted in an arbitrary and capricious manner by rejecting the opinions of his treating physicians. Doc. #54 at 24; see also id. at 24-30. Plaintiff asserts: (1) defendant "acted arbitrarily to reject consistent opinions of examining sources in favor of its hired non-examining consultants[,]" id. at 25; (2) defendant's peer review physicians failed "to meaningfully or accurately engage with the FCE findings[,]" id. at 27 (capitalizations altered); and (3) defendant inappropriately relied on the non-examining peer review physicians when assessing the credibility of plaintiff's pain and fatigue, see id. at 25-27; see also Docs. #58, #62. Defendant contends that substantial evidence supports its

determination, see generally Doc. #53 at 30-40, and that it "considered and reasonably weighed all of the information before it, including the opinions of Plaintiff's treating physicians[,]" the FCE, the "virtual 'IME' report (Dr. Patel), and each independent physician reviewer[.]" Doc. #57 at 30.

"ERISA requires that benefit plans give a 'full and fair review by the appropriate named fiduciary of the decision denying the claim.'" Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208, 212 (2d Cir. 2006) (quoting 29 U.S.C. §1133(2)). "Plan administrators[] ... may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). However, plan administrators are not required "to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. (footnote omitted); accord Demirovic, 467 F.3d at 212 ("[A] plan need not accord the insured's treating physician greater deference than a plan's retained physician.").

1.   *Defendant reasonably rejected the opinions of Dr. Ortega and Dr. Berkower*

    a.   <u>Dr. Ortega</u>

Dr. Ortega submitted a letter dated October 18, 2017, stating that plaintiff was "unable to work at any job due to the debilitating manifestations and progression of his diagnosis[.]" STD1413. She also submitted a Medical Opinion Form dated February 26, 2018, which essentially reiterated that plaintiff was disabled from performing any work. <u>See</u> STD326. Dr. Ortega later reiterated these opinions in February 2020. <u>See</u> AR848.

It was not unreasonable for defendant to reject these opinions. First, during a telephone discussion with Dr. Emad on November 16, 2018, Dr. Ortega "agreed [with Dr. Emad] that [plaintiff] has the capacity to perform full time duty with the provided restrictions and limitations." PW263. This directly contradicts Dr. Ortega's other opinions of record. <u>See</u> PW326; PW582-87.

Second, as defendant contends, the medical evidence of record simply does not support Dr. Ortega's opinion of total disability. The treatment history plaintiff had with Dr. Ortega reflected largely unremarkable findings on examination, including normal muscle tone, no atrophy, and full strength, which largely remained stable over time. <u>See generally</u> STD330, STD335, AR2604, AR907-08, AR797, AR884-87.

Finally, on February 26, 2018, Dr. Ortega appeared for a "telephonic sworn statement" before plaintiff's counsel. See AR 2485. During that sworn statement, Dr. Ortega stated that "over the course of the past year, it seem[ed] like [plaintiff] actually worsened." AR2498. Despite this sweeping statement, Dr. Ortega nevertheless noted that one of plaintiff's most complained of symptoms, namely the decreased sensation in his left leg/foot, had "been a long-standing symptom, ... even since he first had his attack." AR2498. The first demyelinating attack occurred in 2009. See STD625-27. Accordingly, it is reasonable to infer from that statement that plaintiff was able to work until 2017 even while suffering from the decreased sensation in his left leg/foot. This is acknowledged by several of the peer review physicians in their respective opinions. See STD467 (Dr. Snyder: "This claimant has had fixed neurological deficits since 2009 related to prior transverse myelitis due to NMO. The claimant's NMO has apparently remained in remission without further relapses on rituximab. ... However, it is important to point out that the claimant continued to work with these static deficits for several years."); PW253 (Dr. Critchfield: "The available medical records indicate the claimant's difficulties with concentration and psychiatric symptoms are longstanding, and present during time periods when the claimant has been able to maintain employment.").

Substantial evidence, including the opinions of the peer review physicians who spoke with Dr. Ortega, supports defendant's rejection of Dr. Ortega's opinions. There is "nothing in the record indicat[ing] that [defendant] arbitrarily refused to credit [plaintiff's] medical evidence." Hobson, 574 F.3d at 90 (alterations added).

### b.   Dr. Berkower

Dr. Berkower also submitted several opinions asserting that plaintiff was disabled from performing any work. See STD1276, STD1359, STDPW614, AR874, AR2072. It was not arbitrary, or unreasonable, for defendant to reject these opinions.

Dr. Berkower's opinion[9] that plaintiff was unable to work due to difficulties with concentration is not supported by objective evidence in the record, and indeed is contradicted by Dr. Lichtblau's FCE. During the assessment with Dr. Lichtblau, plaintiff "was able to maintain attention adequately." PW733. Additionally, although the FCE restricts plaintiff physically, there are no mental restrictions noted. See PW733-34. As defendant notes, there is not a single mental status examination of record which supports a finding that plaintiff's difficulties with concentrating would preclude plaintiff from all work. See

---

[9] Dr. Berkower's opinion is further undermined by Dr. Ortega's later statement that plaintiff could work, albeit with certain restrictions.

STD414, STD416, STD418, STD422, AR1692-94, AR1700-02, AR877, AR878, AR2046-47, AR2049.

Dr. Berkower's opinion is also not supported by his own examinations, which largely reflect intact findings that remained stable over several years of treatment. See Section I.B.3., supra. Although Dr. Berkower's examinations reflected a loss of proprioception in plaintiff's left leg and foot, those findings, according to Dr. Ortega, were "long-standing" and present at the time plaintiff was maintaining full-time work. See AR2498. Additionally, those symptoms do not necessarily support a finding of total disability, and have otherwise been adequately accounted for in defendant's determination of plaintiff's functional capacity. See AR2700-01.

Given the evidence of record, including the opinions of the peer review physicians, defendant was "not required to accord the opinions of [plaintiff's] treating physicians 'special weight,' especially in light of contrary independent physician reports." Hobson, 574 F.3d at 90 (citing Black & Decker, 538 U.S. at 834). Accordingly, it was not arbitrary, or unreasonable, for defendant to reject the opinions of Dr. Berkower.[10]

_____

[10] To the extent plaintiff relies on the opinion of Dr. Patel as objective support for Dr. Ortega and Dr. Berkower's opinions, the IME does not have the typical indicators of an objective report. For example, Dr. Patel did not physically examine

   2.    *Defendant appropriately relied on the peer review*
         *physicians*

Plaintiff asserts that defendant acted arbitrarily and
capriciously by relying on the opinions of Dr. Emad and Dr.
Grattan because they did not examine plaintiff, and therefore
were unable to adequately judge the credibility of plaintiff's
pain and fatigue. See id. at 25, 28-30. Although Dr. Emad and
Dr. Grattan did not examine plaintiff, each explicitly
considered plaintiff's subjective complaints of pain, and
accounted for those complaints in his determination.

For example, Dr. Emad specifically accounted for
plaintiff's "chronic pain" and "chronic fatigue" when
determining plaintiff's functional capacity. PW263. He also
found that plaintiff's "subjective complaints and reported
limitations are consistent with the objective medical evidence."
PW264. Dr. Emad came to those conclusions after speaking to Dr.
Ortega, who agreed that plaintiff had "the capability to perform
full time duty with the provided restrictions and limitations."
PW263.

Other peer review physicians also accounted for plaintiff's
subjective complaints and credited those complaints in their

---

plaintiff, but rather conducted an IME by video conference. See
AR1163. Dr. Patel also did not have plaintiff's complete medical
record before him, nor did he speak to any of plaintiff's
treating physicians. See id.

opinions. Dr. Kroski noted that plaintiff's "self-reported symptoms as well as clinical findings are supported by progression on imaging of the thoracic spine." PW825; see also PW827. Dr. Snyder also explicitly considered plaintiff's subjective complaints:

> The claimant's reports of chronic pain are consistent with treatment with pain medication regimen. The claimant's reports of left lower extremity sensory disturbance and gait imbalance are consistent with clinical and radiographic findings due to thoracic myelomalacia. The claimant's reports of chronic fatigue and cognitive symptoms are noted, but are not substantiated by objective findings or documentation.

STD466; see also STD467 ("Although the claimant reports fatigue and cognitive symptoms, there is no objective documentation to substantiate that these complaints are limiting or disabling[.] ... Similarly, although the claimant has chronic pain requiring pharmacologic management, there is no documentation to support impairment from this condition[.]").

Dr. Grattan, who reviewed each of these peer review opinions, and who spoke to Dr. Ortega, specifically considered plaintiff's "significant pain" and "severe neuropathic pain" when opining on plaintiff's restrictions and limitations. AR631. Although Dr. Grattan did not examine plaintiff personally, it is significant that he spoke to one of plaintiff's treating physicians during the course of his review. Indeed, Dr. Grattan "agree[d] that" plaintiff "does have

significant limitations[,]" but determined that there was "not clear evidence of cognitive change that would completely prevent his ability to function and he is neurologically stable." AR631. This conclusion is supported by the record, including reports authored by plaintiff's treating physicians indicating that he remained neurologically and mentally stable over several years. See Sections I.B.1., I.B.2., supra. Indeed, Dr. Berkower stated under oath that plaintiff's pain medications "allow[ed] the pain level to significantly stabilize" and "reduce[d] the pain to a level where" plaintiff was "able to live his life" without "severe discomfort[.]" STD344.

Despite plaintiff's claims to the contrary, there is no indication that defendant "disregard[ed] any evidence simply because it is subjective." Doc. #54 at 28. Indeed, "as in Hobson, there is no evidence that [defendant's] independent experts refused to consider the results of [plaintiff's] in-person examinations or ignored his treating physicians." Hafford, 2017 WL 4083580, at *8. Accordingly, "the fact that [plaintiff's] treating physicians disagreed with the physicians that [defendant] retained does not, without more, make the decision to deny benefits arbitrary and capricious." DeCesare v. Aetna Life Ins. Co., 95 F. Supp. 3d 458, 488 (S.D.N.Y. 2015).

Finally, given the evidence of record, defendant was not required to obtain an IME. Where, as here, "the ERISA plan

administrator retains the discretion to interpret the terms of
its plan, the administrator may elect not to conduct an IME,
particularly where the claimant's medical evidence on its face
fails to establish that []he is disabled." Hobson, 574 F.3d at
91. The record contains ample evidence from which defendant
could make a determination as to plaintiff's eligibility for LTD
benefits, including plaintiff's medical records, seven peer
review opinions, and Dr. Lichtblau's FCE. Accordingly, it was
not unreasonable for defendant to rely on the consistent
opinions of the peer review physicians without the benefit of an
IME because "the Second Circuit has held that a plan sponsor is
not required to conduct an in-person examination." Hafford v.
Aetna Life Ins. Co., No. 16CV04425(VEC)(SN), 2017 WL 4083580, at
*8 (S.D.N.Y. Sept. 13, 2017).

Thus, for the reasons stated, it was not unreasonable for
defendant to rely on the decisions of the peer review
physicians, each of whom came to a similar determination that
plaintiff was not disabled within the meaning of the LTD Policy.
See generally Section I.D., supra.

> 3. *Defendant adequately considered Dr. Lichtblau's*
> *FCE*

Plaintiff contends that Dr. Emad and Dr. Grattan "fail[ed]
to meaningfully and accurately engage with the FCE findings[,]"
Doc. #54 at 27. Defendant asserts that it "considered and

reasonably weighed all of the information before it[.]" Doc. #57 at 30.

Plaintiff contends that defendant "cannot be justified in relying on the opinion of a file reviewer [Dr. Emad] who never knew that the treaters' opinion had been objectively confirmed by an FCE." Doc. #54 at 27. Defendant contends, however, that Dr. Lichtblau, "reported numerous observations that were consistent with the restrictions and limitations imposed by" the peer review physicians, Doc. #53 at 33, and the "FCE report is consistent with and supportive of Hartford Life's determination." Doc. #57 at 23.

Dr. Lichtblau determined, in relevant part, that plaintiff did "not have the functional capacity to work 4 hours per day on an uninterrupted basis at this time." PW733 (sic). Dr. Lichtblau placed further restrictions on plaintiff, but ultimately determined plaintiff had "an estimated residual physical functioning strength level from the hips-to-shoulders position to be Sedentary Light[.]" Id. (emphases removed) (sic). Notably, although Dr. Lichtblau's report was drafted in the present tense with respect to plaintiff's functional capacity, Dr. Lichtblau later stated: "It should be understood that this patient is going to suffer from acute, intermittent exacerbations of pain and discomfort and, when he[] experiences acute, intermittent exacerbations of pain and discomfort and, ... he[] will have

good days, bad days, and missed days of work." PW734 (emphasis added). Dr. Lichtblau concluded, in his opinion, "that [plaintiff] will not be able to maintain gainful employment ... secondary to acute, intermittent, exacerbations of chronic pain." Id.

Throughout his briefing, plaintiff relies heavily on this report as objective evidence supporting the opinions of Dr. Ortega and Dr. Berkower. However, a reasonable reading of the FCE also supports the peer review physician opinions. First, as defendant observes, Dr. Lichtblau did not opine that plaintiff lacked the functional capacity to perform all work as of the date of his examination. See Doc. #64 at 14. Rather, a reasonable reading of his report is that plaintiff was able to work, at that time, with breaks. This interpretation is supported by Dr. Lichtblau's statement that plaintiff "should be in a setting which allows him to take breaks[.]" PW733. Additionally, Dr. Lichtblau did not state that plaintiff suffers, in the present tense, "from acute, intermittent exacerbations of pain and discomfort" and as a result has "good days, bad days, and missed days of work." PW734. Rather, this aspect of Dr. Lichtblau's report is phrased in the future tense -- specifically, he predicts that plaintiff "is going to suffer" and "will have good days, bad days, and missed days of work." Id. This suggests that plaintiff may become disabled in the

future, but at the time of the report, plaintiff was not then experiencing such extreme limitations. This reading of the report is further confirmed by Dr. Lichtblau's ultimate opinion, again phrased in the future tense, that plaintiff "will not be able to maintain gainful employment." PW734. This phrasing is significant, because the question before defendant was not whether plaintiff would become disabled at some time in the future, but whether he was presently disabled. See AR123.

Plaintiff does not articulate how Dr. Lichtblau's FCE would have altered the opinion of Dr. Emad. Because Dr. Emad's opinion is similar to that of Dr. Grattan, who had the benefit of the FCE, it is reasonable to infer that the FCE would have had no impact on Dr. Emad's opinion. This is especially true where Dr. Emad had the benefit of discussing plaintiff's condition with Dr. Ortega, who agreed with the limitations found by Dr. Emad. Nevertheless, it bears noting that several of the limitations reflected in Dr. Lichtblau's FCE are also reflected in the peer review opinions, including that of Dr. Grattan. Compare PW733-34, with PW263-64, and AR631.[11]

---

[11] Plaintiff asserts: "The FCE results are plainly disabling, as regular work attendance is a necessary job duty in any occupational circumstance." Doc. #54 at 1. The cases relied on by plaintiff in support of this argument are distinguishable and not controlling precedent. For example, in Tyndall v. Nat'l Educ. Centers, Inc. of California, 31 F.3d 209 (4th Cir. 1994), the question was "whether an employer violated the Americans with Disabilities Act[.]" Id. at 211. Next, unlike here, the

"Where, as here, the terms of an ERISA Plan give its Administrator the sole and absolute authority to interpret the Plan and determine claimants' eligibility for benefits, the Administrator's determinations are subject to a deferential standard of review, which requires only that the Administrator's decision was not arbitrary or capricious." Holley v. Empire State Carpenters Pension Plan, 865 F. Supp. 2d 352, 354 (W.D.N.Y. 2012). Given the other evidence of record previously discussed, including Dr. Lichtblau's own examination findings, plaintiff has not established by a preponderance of the evidence that defendant failed to adequately consider Dr. Lichtblau's FCE.

   B.   Defendant Appropriately Considered the SSDI Decision

   Plaintiff contends that defendant's "decision is erroneous in light of the decision of the Social Security Administration[.]" Doc. #54 at 23. Plaintiff asserts that the award of SSDI benefits "is significant ... as an indicator of

---

Court in Katzenberg applied the more demanding de novo standard of review. See Katzenberg v. First Fortis Life Ins. Co., 500 F. Supp. 2d 177, 191-93 (E.D.N.Y. 2007). Finally, in Nicolas v. MCI Health & Welfare Plan No. 501, No. 2:05CV00442(TJW), 2008 WL 4533728 (E.D. Tex. Sept. 29, 2008), defendant relied on a report that "ignored objective medical evidence in the record[.]" Id. Here, defendant did not ignore the objective evidence. For reasons discussed throughout this Ruling, substantial evidence supports defendant's decision that plaintiff was not "plainly disable[ed.]" Doc. #54 at 21.

how an unbiased and expert federal agency viewed the evidence in this case." Id. at 24.[12] Defendant responds that it appropriately considered the SSA decision, by which it is not bound. See Doc. #57 at 28.

"While SSA awards may be considered when determining whether a claimant is disabled, a plan administrator is not bound by the award and is not required to accord that determination any special deference." Testa v. Hartford Life Ins. Co., 483 F. App'x 595, 598 (2d Cir. 2012) (citation and quotation marks omitted). Nevertheless, the Second Circuit has "encourage[d] plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion[.]" Hobson, 574 F.3d at 92.

The October 5, 2020, denial letter acknowledged the SSDI award, and noted that defenadnt's "disability determination and the SSD determination are made independently and not always the same." AR2701. As explained in that letter, there are "critical

---

[12] Plaintiff asserts that the SSDI decision "places the insurer 'within the penumbra of the doctrine of judicial estoppel[.]'" Doc. #54 at 24 (quoting Darland v. Fortis Benefits Ins. Co., 317 F.3d 516, 529 (6th Cir. 2003)). The authority on which plaintiff relies for this point has long since been overruled by Nord, 538 U.S. 822. See Shelby Cnty. Health Care Corp. v. Majestic Star Casino, 581 F.3d 355, 374 (6th Cir. 2009). The Court declines to further address this argument given plaintiff's failure to support it.

differences between the Social Security disability program and
ERISA benefit plans[.]" Nord, 538 U.S. at 832. Not only does the
definition of disability differ between that used by the SSA and
the LTD policy, but there are also significant differences
regarding how certain evidence is considered. Compare AR2094-98
(SSDI decision), with AR1-148 (LTD Policy), and AR2699-2702
(final denial letter). "Ultimately, the question of whether or
not a claimant is disabled must be judged according to the terms
of the Policy and not according to the SSA's definition."
VanWright v. First Unum Life Ins. Co., 740 F. Supp. 2d 397, 402
(S.D.N.Y. 2010).

Additionally, six out of seven peer review opinions
considered by defendant were not before the SSA. See AR2094-98;
see also Doc. #57 at 9 (citing AR1991-95). Indeed, the SSDI
decision was issued on June 8, 2020, before Dr. Spilker and Dr.
Grattan had rendered their opinions. See AR609-19 (Spilker Peer
Review of Claim Data dated July 2, 2020); AR620-33 (Grattan Peer
Review of Claim Data dated July 15, 2020). Thus, the SSDI
decision did not consider information explicitly relied on by
defendant in its final decision. Therefore, the SSDI decision
"is not determinative, and Hartford's contrary conclusion does
not render it arbitrary and capricious." Wilson v. Hartford &
Emblem Health Servs. Co., LLC, 9 F. Supp. 3d 275, 282 (E.D.N.Y.
2014); see also VanWright, 740 F. Supp. 2d at 402 ("[T]the SSA

determination is one piece of evidence," and "far from determinative." (citation and quotation marks omitted)).

Finally, it is significant that plaintiff asserts that he "has never claimed to be disabled from a neuropsychological condition in anyway." Doc. #58 at 10. The SSDI award was based on plaintiff's limitations resulting from a combination of "severe impairments[,]" including: NMO; "degenerative changes of the thoracic and lumbar spine; neurogenic bladder with intermittent urinary urgency; anxiety disorder; depressive disorder; and attention deficit/hyperactive disorder (ADHD)[.]" AR2094. Accordingly, the SSDI award is "even less relevant" to defendant's disability determination, Doc. #61 at 5 (capitalizations altered), and the SSDI award does not, as plaintiff submits, "weigh strongly in his favor[.]" Doc. #54 at 24.

   C.   Defendant's Vocational Analysis Is not Arbitrary and
        Capricious

Next, plaintiff asserts that defendant's "decision remains fatally flawed from a vocational stand point." Doc. #54 at 30. Plaintiff's argument on this point appears to be twofold. First, plaintiff contends that defendant's decision is arbitrary and capricious because defendant did not provide its vocational expert with all of the limitations found by Dr. Grattan. See id. at 32. Second, plaintiff contends that defendant's decision is

"fatally flawed" because "the need for frequent bathroom access, severe pain, and poor concentration ... were addressed only in a conclusory manner or not at all by Hartford's vocational analysis." Id. Ultimately, plaintiff appears to assert that defendant erred in relying on its vocational experts as opposed to on the report of Ms. Bradford. See generally Doc. #54 at 31-32. Defendant asserts that it appropriately considered Ms. Bradford's report. See Doc. #57 at 27-37.

Plaintiff is correct that the Employability Analysis Report predated Dr. Grattan's peer review, and did not contain all of the limitations found by Dr. Grattan. Compare AR2166, with AR672. However, after receiving Ms. Bradford's report, defendant engaged a Vocational Case Manager to review the Employability Analysis Report, in light of Dr. Grattan's opinion. See AR658, AR2701. The Vocational Case Manager concluded that: "based on this VCM's review of the current restrictions from [Dr. Grattan] the alternative occupations identified in the 11/18/2019 report [are] still viable occupations. There are no changes to this review." AR658. Accordingly, all of the limitations found by Dr. Grattan were ultimately factored into defendant's vocational analysis.

Next, plaintiff asserts that defendant's reliance on its vocational experts was arbitrary and capricious because the "expert offered no reason for disagreeing with Ms. Bradford[,]"

and "did not address the impact of severe pain and poor
concentration at all[.]" Doc. #54 at 31. Essentially,
plaintiff's argument appears to take issue with defendant's
vocational experts' reliance on the peer review opinions. By
contrast, to form her opinion, Ms. Bradford relied primarily on
plaintiff's medical evidence, including the opinions of Dr.
Ortega, Dr. Berkower, and Dr. Patel. See AR674.

"The administrative record[] ... contains contrary evidence
on which Hartford was entitled to rely[]" when making its
vocational assessment. Fortune v. Grp. Long Term Disability Plan
for Emps. of Keyspan Corp., 391 F. App'x 74, 77–78 (2d Cir.
2010). "[T]he mere existence of conflicting evidence does not
render ... [an administrator's] decision arbitrary or
capricious." Rozek v. New York Blood Ctr., 925 F. Supp. 2d 315,
334 (E.D.N.Y. 2013). Because it was "not unreasonable [for
defendant] to rely on independent peer medical reviews that
[we]re conducted by licensed physicians and based on a complete
review of [plaintiff's] medical file[,]" plaintiff's arguments
"do not support an inference that Hartford's reliance on the
determinations of its own in-house vocational consultants was
arbitrary and capricious." Rund v. JPMorgan Chase Grp. Long Term
Disability Plan, 855 F. Supp. 2d 185, 201–02 (S.D.N.Y. 2012).

To the extent plaintiff contends defendant failed to
adequately consider Ms. Bradford's opinion, that is belied by

the record. In response to Ms. Bradford's report, defendant engaged the VCM to review the Employability Analysis Report in the context of Dr. Grattan's peer review opinion. See AR649. Additionally, the final claim denial letter explicitly references Ms. Bradford's vocational report. See AR2701.

In sum, plaintiff has failed to establish that defendant acted in an arbitrary and capricious manner when undertaking its vocational analysis.

D.   Plaintiff Has not Met his Burden of Establishing that He Is Disabled Under the Terms of the Life Policy

Plaintiff asserts that the evidence he has presented establishes that he is disabled under the terms of the LTD Policy. See Doc. #53 at 13-14; see also Doc. #63 at 9.

"The Plaintiff bears the burden of proving by a preponderance of the evidence that []he is disabled within the meaning of the plan." Beardsley v. Hartford Fire Ins. Co., No. 3:18CV2056 (MPS), 2020 WL 5441322, at *8 (D. Conn. Sept. 10, 2020). Given the deferential standard of review, and the totality of the evidence in the record, the evidence presented by plaintiff does not establish by a preponderance of the evidence that he is disabled within the meaning of the LTD Policy. Substantial evidence supports defendant's decision, including: seven peer review opinions; hundreds of pages of medical records; and the opinions of two vocational experts.

> While plaintiff's interpretation of the record [could]
> be reasonable, ... [defendant's] balancing of the
> evidence does not fall so far outside the range of its
> discretion as to constitute arbitrary and capricious
> decision making that it was without reason, unsupported
> by substantial evidence or erroneous as a matter of law.

Waterbury v. Liberty Life Assurance Co. of Bos., No.

1:03CV01492(DNH), 2005 WL 8169569, at *5 (N.D.N.Y. Dec. 22,

2005), aff'd sub nom. Waterbury v. Liberty Life Assur. Co., 202

F. App'x 477 (2d Cir. 2006).

Thus, for the reasons stated, defendant's determination is

supported by substantial evidence, and the decision to deny

plaintiff LTD benefits was not arbitrary and capricious.

**IV.  Conclusion**

Accordingly, for the reasons stated, the Court **AFFIRMS** the

administrative decision of defendant to deny LTD benefits.

Judgment shall enter in favor of Aetna Life Insurance

Company and Hartford Life and Accident Insurance Company. The

Clerk of the Court shall close this case.

It is so ordered at Bridgeport, Connecticut, this 20th day

of July, 2022.

```
                          /s/
                   _____
                   HON. SARAH A. L. MERRIAM
                   UNITED STATES DISTRICT JUDGE
```